UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| VINAY KARAMSETTY,<br><br>Plaintiff,<br><br>v.<br><br>WELLS FARGO & COMPANY, et al.,<br><br>Defendants. | Case No. 12-cv-01364-JCS<br><br>**ORDER GRANTING DEFENDANTS'<br>MOTION FOR SUMMARY<br>JUDGMENT, OR IN THE<br>ALTERNATIVE, SUMMARY<br>ADJUDICATION; AND OVERRULING<br>PLAINTIFF'S OBJECTIONS TO THE<br>DECLARATIONS OF LAURA HURLEY<br>AND KATHLEEN CAHILL SLAUGHT**<br><br>**Dkt. Nos. 42, 50, 54**<br><br>**PUBLIC VERSION** |

## I.    INTRODUCTION

This action arises under the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. §§ 1101 *et seq*.  Plaintiff Vinay Karamsetty ("Plaintiff") filed this lawsuit against Defendants Wells Fargo & Company ("Wells Fargo") and Wells Fargo Company Salary Continuation Pay Plan ("the Plan").  Plaintiff, a citizen of India, had been a Wells Fargo employee since 2007.  In 2009, due to Wells Fargo's acquisition of Wachovia Mortgage and the then-current economic climate, Wells Fargo implemented a new policy to stop its employer-sponsorship of immigrant visa applications and extensions.  Plaintiff resigned from his position at Wells Fargo in February 2010 before his visa expired in June 2010.  Plaintiff submitted a claim for severance benefits under the Plan, and the claim was denied.

Plaintiff brings this lawsuit under ERISA § 502(a)(1)(B), 29 U.S.C. § 1132(a)(1)(B), contending he is entitled to severance benefits because Wells Fargo's refusal to renew his visa is a qualifying event under the Plan.  Plaintiff also brings a claim under ERISA § 510, 29 U.S.C. § 1140, contending that Wells Fargo's implementation of the policy not to renew immigrant visas

United States District Court<br>Northern District of California

was intended to interfere with Plaintiff's right to severance benefits owed to him under the Plan. Defendants filed a Motion for Summary Judgment, or in the Alternative, Summary Adjudication ("Motion"), as to both claims.  The Court held a hearing on the Motion on June 28, 2013, at 9:30 a.m.  For the reasons explained below, the Motion is GRANTED.[1]

## II.    BACKGROUND

### A.    Factual Background

On or about July 17, 2007, Plaintiff began working as a Web Developer in Wells Fargo's Internet Services Group, earning an annual salary of approximately $115,000.  Dkt. No. 42-1 (Joint Statement of Undisputed Material Facts) ("JSUF") ¶ 12.  Plaintiff is a citizen of India.  At the time Plaintiff commenced employment at Wells Fargo, he was eligible to work in the United States pursuant to an employer-sponsored H1-B visa that was set to expire in approximately June 2010.  *Id.* ¶ 13.  However, in March 2009, Wells Fargo changed its policy regarding its sponsorship of employee visas (hereafter "the Policy").  *Id.* ¶ 14.

While there is no evidence that the full Policy has ever been documented, there is a written "Summary of the Policy" which was provided to the Human Resources ("HR") division of Wells Fargo.  Declaration of Laura Hurley in Support of Defendants Motion for Summary Judgment ("Hurley Decl.") Ex. A at WF 400-03.  The Summary of the Policy states that its "purpose is to provide the HR community clarification regarding visa sponsorship going forward."  *Id.*  The next line states that "[d]ue to the merger of the companies and the current economic climate, Wells Fargo found it necessary to re-evaluate our visa sponsorship practices."  *Id.*  The Summary of the Policy states that Wells Fargo will end its practice of sponsoring visa applications for new employees and visa extensions and renewals for its current employees, but also allows for limited exceptions.  *See id.*

On March 30, 2009, HR Managers at Wells Fargo were sent an email labeled "confidential" which updated them on the progress of Wells Fargo's visa Policy.  Declaration of Allison H. Goddard in Support of Plaintiff's Opposition to Defendants' Motion for Summary

---

[1] The parties have consented to the jurisdiction of the undersigned magistrate judge pursuant to 28 U.S.C. § 636(c).

United States District Court
Northern District of California

1  Judgment ("Goddard Decl."), Ex. 8.  The email reiterated that "Wells Fargo found it necessary to

2  re-evaluate our visa sponsorship practices due to the merger and the current economic climate."

3  *Id*.  One part of the email read: "You may have a team member on a visa or their manager ask you

4  about salary continuation in these situations.  In the attached you will find the response that

5  Corporate legal has provided."  *Id*.

6       The email included an attachment entitled "Wells Fargo Visa Sponsorship – Talking Points

7  for TOG HR."  One of the talking points stated the following:

8          There have been some inquiries from team members whether they
9          are eligible for severance if the company is making the decision not
        to renew or sponsor visas.  The response Corporate legal has crafted
10         for HR to use is as follows:

11         *Eligibility for severance benefits is based on a change to a team
        *member's position (such as job elimination, work location or salary*
12         *reduction), not the team member's employment eligibility status.  If*
        *a team member is not employment eligible, he/she cannot continue*
13         *to be employed at Wells Fargo. Wells Fargo, like other employers,*
        *may chose [sic] to sponsor employees on employment-sponsored*
14         *visas, such as H1-Bs, but it is not a requirement that Wells Fargo do*
        *so.  The fact that Wells Fargo has chosen not to sponsor a team*
15         *member for a employer-sponsor [sic] visa does not trigger salary*
        *continuation benefits.*
16

17 *Id*. at 227-28 (emphasis in original).

18      Plaintiff first learned about the Policy from an article in the Wall Street Journal.  Goddard

19 Decl., Ex. 11.  On April 1, 2009, Plaintiff wrote an email to a Wells Fargo HR employee inquiring

20 whether the article was true.  *Id*.  The HR employee, Kate Jones, first forwarded the email to a

21 coworker, asking: "What the heck should I say to him?"  *Id*.  Ms. Jones then responded to

22 Plaintiff's email later that day:

23         Vinay
24         There is no general email going out to H1B visa holders about
        letting the visa's expire – we're not sure where this email came from
25         or who it went to.  We are however looking at our H1B's visa's [sic]
        on a case by case basis and should have more information soon.
26

27 Goddard Decl. Ex. 12 at 239.

28      On April 6, 2009, Plaintiff's supervisor Lawrence Hsu personally informed Plaintiff that

United States District Court
Northern District of California

3

1   Wells Fargo decided not to renew his visa when it expired in June 2010.  JSUF ¶ 15.  Mr. Hsu had

2   been instructed by HR that he should only have verbal conversations about this with Plaintiff and

3   not to put anything in writing.  Goddard Decl. Ex. 31 (Excerpts from the Deposition of Lawrence

4   Hsu) ("Hsu Depo.") at 35:20-24.  Mr. Hsu could not recall any other time when HR had asked him

5   not to put something in writing.  Hsu Depo. at 35-37.  Plaintiff was informed by memo dated April

6   17, 2009 that he could not post for other positions within Wells Fargo due to employer-based visa

7   restrictions.  JSUF ¶ 16.

8        The Summary of the Policy provides that current Wells Fargo employee visa-holders, with

9   the help of their hiring managers and HR, may submit a request for a business case exception for

10  Wells Fargo to sponsor the renewal of their visas.  Hurley Decl. Ex. A at WF 401-02.  HR

11  managers were also told that "[w]here managers feel the role is <u>critical</u> to the business they may

12  submit an updated business case," but also stated that "**It is anticipated that very few business**

13  **cases will be approved**.  Recruiting Consultants will set this expectation with managers."

14  Goddard Decl. Ex. 8 at 227 (emphasis in original). There is a list of thirty-two Wells Fargo

15  employees whose H-1B visas were extended even under the Policy.  Hurly Decl. ¶ 9 and Ex. C

16  thereto.

17        In April 2009, Mr. Hsu told Plaintiff that he would submit a business case exception on

18  Plaintiff's behalf.  Declaration of Kathleen Cahill Slaught in Support of Defendants' Motion for

19  Summary Judgment ("Cahill Decl."), Ex. A (Excerpts from the Deposition of Vinay Karamsetty)

20  ("Karam. Depo.") at 69:18-20.  However, Mr. Hsu delayed in doing so, apparently under the belief

21  that it would be better to wait until it was closer to the visa expiration date in June 2010.  *Id*. at

22  68:12-19.

23        On February 16, 2010, Plaintiff told Mr. Hsu that he would be resigning.  Plaintiff testified

24  that at the time he wrote his resignation email, he understood that Mr. Hsu would file the

25  extension anytime that month.  Karam. Depo. at 69:1-6.  Mr. Hsu testified that he was not

26  surprised to learn that Plaintiff was ending his employment.  He stated that "[b]ecause there was a

27  policy that H-1Bs would not be renewed..., it was certainly understandable that he was looking out

28  for something that was viable for him."  Hsu Depo. at 58:5-12.  Mr. Hsu also testified that he was

United States District Court
Northern District of California

4

1   not aware of any exceptions to the Policy that were granted.  Hsu Depo. at 53:12-15.  Mr. Hsu had

2   informed Plaintiff of that fact.  Karam. Depo. at 69:18-20.

3           At Mr. Hsu's request, Plaintiff followed-up with a resignation email:

4           Hi Larry

5           Please accept this email as my two-weeks' notice of resignation.
            My last of work will be Mar 1st 2010.
6
            While I have been very satisfied at Wells Fargo, I have decided to
7           make this move to advance my career.  I have enjoyed working with
            you and appreciate the opportunities I have been given here.
8
            I will do my best to hand off my current projects prior to Mar 1st.
9           Please let me know if you need my help in any other way.

10          Regards,

11          Vinay

12  Eggers Decl. Ex. A at 33; Goddard Decl. Ex. 32, Karam. Depo. at 57:20-25 - 58:1-2; *see also*

13  JSUF ¶ 17.  Plaintiff testified that even though the email states Plaintiff was leaving "to advance

14  [his] career," Ms. Hsu knew the real reason Plaintiff was leaving was the expiration of his H1-B

15  visa.  Karam. Depo. at 58.  Plaintiff explained that because he is not good with English phrases, he

16  used a sample resignation letter he found on the internet to write this email.  *Id*. at 58-60.

17          Plaintiff testified that prior to his last day of employment with Wells Fargo, he inquired at

18  least twice whether he would receive severance benefits, and whether he would receive severance

19  benefits if he stayed to the last day of his eligibility circumstance.  JSUF ¶¶ 18-19.  Plaintiff

20  testified that the answer to these questions on both occasions was "no."  *Id*.

21          Plaintiff's last day of work was March 2, 2010.  JSUF ¶ 20.  Plaintiff attended an exit

22  interview with Evelyn Dubon on that day.  *Id*. ¶ 21.  During the exit interview, Plaintiff informed

23  Ms. Dubon that he was leaving due to Wells Fargo's Policy not to renew his visa and because he

24  had found a new job.  Eggers Decl. at 34.  Plaintiff told Ms. Dubon that he felt there had been a

25  "hidden message," as he was told H1-B visa extensions would be determined on a case by case

26  basis, but had not heard of Wells Fargo sponsorship of anyone's visa renewal or extension.

27  Plaintiff also stated that the Policy should have been treated as a layoff.  *Id*.  Because he had heard

28  that the Policy was implemented due to the economic conditions and merger with Wachovia

United States District Court
Northern District of California

5

Mortgage, Plaintiff believed those affected by the Policy should have been considered to have experienced a displacement of position.  *Id*.  Plaintiff also stated that he felt like Wells Fargo discriminated against foreign nationals.  *Id*. at 35.

At the interview, Plaintiff also inquired whether he would be eligible for severance benefits.  Ms. Dubon said she did not believe so but would follow-up.  Weeks later, Plaintiff wrote an email to Ms. Dubon asking about the possibility of benefits.  Goddard Decl. Ex. 17 at 249.  Plaintiff was directed to communicate with Kelly Francovich since Ms. Dubon was no longer working with the Internet Services Group. *Id*.  Ms. Francovich wrote Plaintiff an email on September 28, 2010:

> Vinay,
>
> Team members become eligible for Wells Fargo's salary continuation plan when their positions are eliminated or there is a qualifying event that meets the definition of a substantial position change.
>
> This is not the case with non renewal of H1B visas, therefore, you are not eligible to receive severance pay under our plan.

Goddard Decl. Ex. 17 at 248.

### B.    Wells Fargo's Displacement Selection Process

Wells Fargo laid-off thousands of workers after acquiring Wachovia Mortgage.  *See* Eggers Decl. ¶¶ 5-6.  HR employees at Wells Fargo were instructed to watch a two-hour PowerPoint lecture entitled "Selection Guidelines for Displacement Activities" to learn how to select which employees to include in the displacement process.  *See* Goddard Decl. Ex. 6 (Selection Guidelines for Displacement Activities).  "Selection Process" is defined in the PowerPoint as the "[m]ethod and process for identifying and selecting team members for displacement." *Id*. at 10.  The objectives of this training were to teach HR employees appropriate selection methods and criteria, as well as the triggering events under the Plan which entitled employees to benefits.  *Id*. at 7.

HR employees were also provided with a document entitled "Displacement Selection Process for Team Members on Employer-sponsored Visas and Student Visas."  *See* Hurley Decl. Ex. B.  This document states that it "describes the procedures for HR to use, in conjunction with

6

the 'Selection Guidelines for Displacement Activities,' when the displacement selection process involves team members on employer sponsorships and certain student visas." *Id.*  The document instructs HR employees to take certain steps "[a]fter HR has finished the evaluation of determining the appropriate candidate pool[.]" *Id.*

HR employees are first instructed to identify which Wells Fargo employees require visas and to determine their corresponding expiration dates. *Id.*  Then, HR employees are instructed to "[r]eview the work authorization expiration date to determine if the team member should be included in the selection process." *Id.* at 414.  HR employees are instructed to follow the normal selection process for employees whose work authorizations expire *after* the date of the anticipated Notice Period,[2] and are told that these employees will be eligible to receive severance benefits. *Id.*; *see also* Eggers Decl. ¶ 6 ("the Plan paid lump sum severance to individuals who held H1-B visas, whose visa expiration date followed their lump sum severance payout under the Plan."). HR employees are also instructed to exclude from the selection process employees whose work authorizations expire *before* the end of the anticipated Notice Period, and further states that those employees will *not* be eligible for severance benefits.  *See* Hurley Decl. Ex. B. at 414.

The "Displacement Selection Process for Team Members on Employer-sponsored Visas and Student Visas" ends with a "Q & A."  One "Q & A" is as follows:

> **Is a team member eligible for SCL benefits if management decides not to pursue a visa renewal or new visa sponsorship for that team member?**
>
> **Answer:** No, the decision to not renew or seek a new visa does not equate to job elimination.  The situations that qualify as a job elimination for the purpose of determining eligibility for SCL benefits are described in the "Selection Guidelines for Displacement Activities.

Goddard Decl. Ex. 7 at 417 (emphasis in original).

### C.    The Plan

---

[2]  As discussed further below, Notice Period is defined in the Wells Fargo & Company Salary Continuation Pay Plan as "the period of time communicated to the Participant in a written notice of a Qualifying Event."  JSUF ¶ 5.  A "Qualifying Event," in turn, is defined as a Position Elimination or Substantial Position Change.  Eggers Decl. Ex. A at 133.

United States District Court
Northern District of California

The Wells Fargo & Company Salary Continuation Pay Plan ("the Plan") is designed to provide income to plan participants in the event of job displacements.  Declaration of Stacey Eggers ("Eggers Decl.") Ex. A at 131.  The Plan provides that a "Participant shall qualify for Salary Continuation Pay if the Participant (1) experiences a Qualifying Event, (2) he/she executes the Agreement and Release Provided pursuant to Section 4.3 of this Plan, and (3) he/she is not disqualified under Section 3.2."  JSUF ¶ 7.  The Parties dispute whether the first and third prongs − whether Plaintiff experienced a Qualifying Event and whether Plaintiff is disqualified under Section 3.2.

The Summary Plan Description for the Plan states that "[t]here are two events that may qualify [a participant] for salary continuation pay under the Plan − a Position Elimination or a Substantial Position Change."  Eggers Decl. Ex. A at 133.  Plaintiff does not argue that there was a Substantial Position Change entitling him to benefits under the Plan.  Rather, he argues that there was a Position Elimination, which is defined as the "[e]limination of all or part of the position held by a Participant or any other form of reduction in force initiated by [Wells Fargo] affecting a Participant's position."  JSUF ¶ 8.

Section 3.2 states several "Disqualifying Events" which disqualify a participant from receiving benefits under the Plan.  One such disqualifying event is when "the Participant commences employment outside of the Company … prior to completion of the Participant's Notice Period."  JSUF  ¶ 6.  Another disqualifying event is when "the Participant's employment with the Company … is terminated prior to completion of the Notice Period[.]"  *Id*.  Section 2.16 of the Plan defines the term "Notice Period," in relevant part, as "the period of time communicated to the Participant in a written notice of a Qualifying Event.  Generally, the Notice Period is not less than 60 days; however there may be business circumstances in which a Participant's business unit provides a shorter Notice Period."  *Id*. ¶ 5.

[REDACTED].  Eggers Decl. ¶ 4.  During 2010, the Plan Administrator considered 23 claims and 10 appeals of claim denials requesting entitlement to severance benefits.  *Id*.  All claims and appeals filed in 2010 were denied. Goddard Decl. Ex. 4 (Defendants' Objections and Responses to Interrogatories) at 8:2.  [REDACTED].  Eggers Decl. ¶ 5. All claims and appeals

filed in 2011 were denied.  Goddard Decl. Ex. 4 at 8:5.

> **D.      Plaintiff's Claim for Benefits under the Plan**

Through his counsel, Plaintiff submitted a claim for severance under the Plan on December 21, 2010.  JSUF ¶ 25.  The claim alleged that Wells Fargo's non-renewal of Plaintiff's visa constituted a Position Elimination, a Qualifying Event entitling him to severance under the Plan. *Id*. ¶ 26.  The claim states, in relevant part:

> Mr. Karamsetty continued working at Wells Fargo until March 1, 2010, when he was constructively terminated by Wells Fargo.  As Wells Fargo is no doubt aware, refusing to renew an H1B visa is equivalent to a termination, giving Mr. Karamsetty no other choice but to seek alternative employment so that he could preserve his lawful immigration status.

Eggers Decl. Ex. A at 45.

The Plan Administrator delegated discretionary authority to Cha Sanders, a member of Wells Fargo's Corporate Relations Services Department, to evaluate Plaintiff's claim.  JSUF ¶ 27. By letter to Plaintiff's attorney dated April 22, 2011, Ms. Sanders denied the claim.  Eggers Decl. Ex. A at 40.  Ms. Sanders wrote, in relevant part:

> Under the Plan, a Position Elimination is a Qualifying Event.  Wells Fargo did not eliminate Mr. Karamsetty's position.  On the contrary, once Mr. Karamsetty's visa expired, he would no longer be able to fulfill the requirements of his position.  Wells Fargo does not guarantee visa extensions and wanted to provide Mr. Karamsetty adequate notice of the fact that his visa would not be extended. Also, it is important to note that Wells Fargo had to hire a contractor to perform the duties of Mr. Karamsett's position following his resignation.

*Id*. at 41.  Ms. Sanders also wrote: "Further, Mr. Karamsetty's decision to resign effective March 1, 2010 disqualified him from consideration for Plan benefits."  *Id*. at 42.

By letter dated June 20, 2011, Plaintiff appealed the denial of his claim with the assistance of counsel.  Eggers Decl. Ex. A at 106-08.  Plaintiff argued that the Plan Administrator erred in concluding that Wells Fargo's decision not to renew Plaintiff's H1B visa was not a "Position Elimination," which is defined as  "an elimination of your job *or any other form of reduction in force initiated by Wells Fargo affecting a Participant's position*."  JSUF ¶ 8 (emphasis added).

1    Plaintiff argued that the "Plan Administrator admits that Mr. Karamsetty's job was eliminated in

2    her denial letter, since Wells Fargo hired a contractor, not a full-time employee, to replace Mr.

3    Karamsetty." *Id*. at 107.  Plaintiff also argued that the Plan Administrator ignored the second

4    clause of the definition of a "Position Elimination," because "Wells Fargo's decision not to renew

5    Mr. Karamsetty's and other similarly situated employees' HIB visas in early 2009 constituted a

6    reduction in force."  Eggers Decl. Ex. A at 106.

7         The Plan Administrator delegated discretionary authority to the members of the Wells

8    Fargo & Company Salary Continuation Pay Plan Appeals Committee ("Committee") to adjudicate

9    appeals from a denial of benefits.  *See* JSUF ¶ 11.  On September 1, 2011, the Committee denied

10   Plaintiff's appeal, writing: "[T]he Committee could not find any support for your position that Mr.

11   Karamsetty's position as a Web Developer had been eliminated, thus triggering a Qualifying

12   event."  Eggers Decl. Ex. A at 251.  The Committee reasoned that "contractors can be used to

13   fulfill job duties at the business unit's discretion and its decision to move forward with a

14   contractor, with the same or similar duties, does not deem a job eliminated."  *Id*. at 252.  The

15   Committee further reasoned that the "[s]ubsequent posting of the job further supports the

16   Committee's opinion that Mr. Karamsetty's position was not eliminated through a reduction in

17   force."  *Id*.  The Committee also found that Plaintiff "lost his 'participant' status when he tendered

18   his voluntary resignation of employment on February 16, 2010," thus removing him from

19   eligibility under the Plan.  *Id*. at 253.  *Id*.

20        Handwritten notes of the Committee are also in evidence before the Court.  The

21   handwritten notes state: "Decision consistent with change in visa sponsorship policy."  Goddard

22   Decl. Ex. 27 at 279.

23        **E.    The Declaration of Laura Hurley**

24        Defendants have submitted the Declaration of Laura Hurley.  Ms. Hurley is the Executive

25   Vice President of Human Resources for Wells Fargo, and has worked for Wells Fargo for

26   approximately thirteen years.  Hurley Decl. ¶ 1.  Ms. Hurley states in her declaration that in 2008

27   and 2009, she "was present during discussions on development and implementation of Wells

28   Fargo's revised visa sponsorship policy."  *Id*. ¶ 2.  Ms. Hurley writes the following in her

United States District Court
Northern District of California

10

declaration about the intended purpose of the Policy:

> The purpose of the Policy was to decrease Wells Fargo's reliance on employer-sponsored visas by utilizing the overall increased talent pool of individuals within Wells Fargo as a result of its merger with Wachovia Mortgage, and within the United States, who did not require visa sponsorship to work within the United States.  Wells Fargo implemented the Policy to ensure that visas were sponsored and/or renewed only in cases of substantiated business necessity. (*Id*. ¶ 3.)

> The Policy was not intended to interfere with the rights of any H1-B visa holder to become eligible for severance under the Wells Fargo & Company Salary Continuation Plan ("Plan"). (*Id*. ¶ 4.)

> I am not aware of any consideration of Plan benefits and/or eligibility as a factor in Wells Fargo's decision to implement the Policy. (*Id*. ¶ 5.)

> I am not aware of any consideration of potential Plan severance payouts to H1-B visa holders as a factor in Wells Fargo's decision to implement the Policy. (*Id*. ¶ 6.)

When asked at her deposition to clarify her involvement with the Policy, Ms. Hurley testified that she was "involved" in the discussions around the Policy, but "wasn't involved in drafting the policy" and did not have a decision-making role in developing the policy.  Hurley Depo. at 50:17-19; 54:13-15.  Ms. Hurley stated that she "doubt[ed] that [she] participated in all of the discussions" about the Policy.  *Id*. at 53:14-15.

**F.      The Motion for Summary Judgment**

Defendants move for summary judgment on Plaintiff's claim for benefits under ERISA § 502(a)(1)(B).  Defendants argue there was no abuse of discretion when Plaintiff was denied severance benefits Plaintiff did not experience a qualifying event that would have triggered entitlement to benefits under the Plan.  Defendants argue that Plaintiff voluntarily terminated his employment with Wells Fargo when he resigned in February 2010, and that even if Plaintiff had stayed until the expiration of his visa in June 2010, he would still not have been entitled to severance because the expiration of his visa was not a qualifying event under the Plan.

Defendants also move for summary judgment on Plaintiff's claim under ERISA § 510 on two grounds.  First, Defendants argue the claim is time-barred and equitable tolling does not

11

1   apply. Second, Defendants contend the Section 510 claim fails on its merits because there is no

2   evidence Wells Fargo discriminated against Plaintiff for the purpose of interfering with his

3   benefits. Defendants argue that Plaintiff cannot make out a prima facie case of discrimination, and

4   that even if he could, Plaintiff cannot establish that Defendant's legitimate, nondiscriminatory

5   reason for implementing the policy is pretext for discrimination.

6           Plaintiff opposes the Motion on all grounds.

7   **III.    DISCUSSION**

8           **A.    Plaintiff's Evidentiary Objections**

9           Plaintiff objects to the Court's consideration of paragraphs 3 - 6 of the Declaration of

10  Laura Hurley on the basis that Ms. Hurley lacks personal knowledge. In paragraph 3, Ms. Hurley

11  articulates Wells Fargo's purported legitimate, non-discriminatory reason for implementing the

12  Policy, and in paragraph 4, states that the Policy was "not intended to interfere with the rights of

13  any H1-B visa holder to become eligible for severance." Hurley Decl. ¶¶ 3-4. Ms. Hurley

14  testified in her deposition that she did not draft the Policy, did not participate in all of the

15  discussions surrounding its development, and had no decision-making role in its development.

16  Hurley Depo. at 50:17-19; 53:14-15; 54:13-15. Plaintiff therefore argues that Ms. Hurley lacks

17  personal knowledge to testify to the Policy's purpose and intent. Plaintiffs states that paragraphs 5

18  and 6 are "objectionable" because Ms. Hurley fails to state any affirmative facts, but rather

19  testifies that she is "not aware" of any consideration of benefits or severance as a factor in Wells

20  Fargo's decision to implement the Policy. Hurley Decl. ¶¶ 6-7.

21          Defendants argue that Ms. Hurley has established her personal knowledge because she also

22  writes in her declaration that she was "present during discussions on development and

23  implementation of" the Policy. Hurley Decl. ¶ 2. Defendants contend that under Plaintiff's

24  theory, Wells Fargo cannot state the purpose of the Policy unless each individual that participated

25  in discussions about the Policy offers their own testimony about its purpose and intent.

26  Defendants further argue that Plaintiff's objections to paragraphs 5 and 6 should be overruled

27  because Plaintiff cites no legal authority to support these objections.

28          The Court agrees with Defendants. As to paragraphs 5 and 6, Plaintiff has not articulated

United States District Court
Northern District of California

1    any legal basis for exclusion.  As to paragraphs 3 and 4, the Court finds that Ms. Hurley has

2    established personal knowledge because was "present" during the "discussions on and

3    implementation of" the Policy.  Hurley Decl. ¶ 2.  Moreover, "[p]ersonal knowledge may be

4    inferred from a declarant's position" in a company.  *In re Kaypro*, 218 F.3d 1070, 1075 (9th Cir.

5    2000).  Ms. Hurley is the Executive Vice President of Human Resources for Wells Fargo, and has

6    worked for Wells Fargo for approximately thirteen years, Hurley Decl. ¶ 1, thus further

7    establishing her personal knowledge.

8        Plaintiff also objects to the Declaration of Kathleen Cahill Slaught in Support of

9    Defendants' Reply in Support of their Motion for Summary Judgment on grounds of relevance

10    and prejudice.  The Court did not rely on this declaration and supporting exhibits, and therefore,

11    need not decide this issue.

12        **B.        Legal Standard**

13        Plaintiff's two ERISA claims require somewhat distinct legal standards.  With respect to

14    Plaintiff's claim under ERISA § 510, the Court applies traditional principles of summary

15    judgment.  Such principles require that "summary judgment must be denied if, 'viewing the

16    evidence in the light most favorable to the non-moving party,' there are genuine issues of material

17    fact."  *Nolan v. Heald College*, 551 F.3d 1148 (9th Cir. 2009) (quoting *Leisek v. Brightwood*

18    *Corp.*, 278 F.3d 895, 898 (9th Cir. 2002)).  Summary judgment is appropriate "if the movant

19    shows that there is no genuine dispute as to any material fact and the movant is entitled to

20    judgment as a matter of law."  Fed.R.Civ.P. 56(a).

21        With respect to the claim for benefits under ERISA § 502(a)(1)(B), however, courts apply

22    the abuse of discretion standard if the plan terms "unambiguously provide discretion to the

23    administrator."  *Abatie v. Alta Health & Life Ins. Co.*, 458 F.3d 955, 963 (9th Cir. 2006).  Section

24    5.1 of the Plan confers discretionary authority to the Plan Administrator, and the Plan

25    Administrator delegated such authority to the Committee to review Plaintiff's appeal.  *See* JSUF

26    ¶¶ 10-11.  Thus, the Court reviews their decisions for abuse of discretion, and will find an abuse of

27    discretion if the Plan Administrator and/or Committee "(1) renders a decision without explanation,

28    (2) construes provisions of the plan in a way that conflicts with the plain language of the plan, or

United States District Court
Northern District of California

13

(3) relies on clearly erroneous findings of fact." *Boyd v. Bert Bell/Pete Rozelle NFL Players Ret. Plan*, 410 F.3d 1173, 1178 (9th Cir. 2005).

"The manner in which a reviewing court applies the abuse of discretion standard, however, depends on whether the administrator has a conflicting interest." *Montour v. Hartford Life & Acc. Ins. Co.*, 588 F.3d 623, 629 (9th Cir. 2009). There is a structural conflict of interest in this case because Wells Fargo acts as both the insurer of the Plan, as well as the Plan Administrator. *Id.* at 630 ("since it is also the insurer, benefits are paid out of the administrator's own pocket, so by denying benefits, the administrator retains money for itself."). The Supreme Court has stated that a "conflict must be weighed as a factor in determining whether there is an abuse of discretion." *Firestone Tire and Rubber Company v. Brunch*, 489 U.S. 101, 115 (1989). Courts in the Ninth Circuit are instructed to weigh a conflict of interest "based on the degree to which the conflict appears improperly to have influenced a plan administrator's decision." *Montour*, 588 F.3d at 631. Traditional rules of summary judgment apply in determining the extent to which a conflict of interest influenced an administrator's decision. *Nolan v. Heald College*, 551 F.3D 1148, 1154 (2009).

### C.     ERISA § 502(a)(1)(B), 29 U.S.C. § 1132

Two issues must be decided with regard to Plaintiff's first claim for benefits under Section 502(a)(1)(B). The first issue is what effect, if any, the structural conflict of interest should have on this Court's review of the claim. The second issue is whether the Plan Administrator and review Committee abused their discretion in denying Plaintiff's claim for benefits under the Plan, taking into account "the degree to which the conflict appears improperly to have influenced" their decisions. *Montour*, 588 F.3d at 631.

#### 1.     *Conflict of Interest*

The Ninth Circuit has provided guidance on the extent to which a conflict of interest should be weighed when reviewing for abuse of discretion. "The level of skepticism … may be low if a structural conflict of interest is unaccompanied, for example, by any evidence of malice, of self-dealing, or of a parsimonious claims-granting history." *Abatie*, 458 F.3d at 968. A court may also give a conflict less weight if the administrator takes active steps to reduce potential bias

1   and promote accuracy. *Metropolitan Life Ins. Co. v. Glenn*, 554 U.S. 105, 117 (2008). By

2   contrast, courts should weigh a "conflict more heavily if, for example, the administrator provides

3   inconsistent reasons for denial, … fails adequately to investigate a claim or ask the plaintiff for

4   necessary evidence, …fails to credit a claimant's reliable evidence, … or has repeatedly denied

5   benefits to deserving participants by interpreting plan terms incorrectly or by making decisions

6   against the weight of evidence in the record." *Abatie*, 458 F.3d at 968-69.

7         In this case, there is some evidence that the structural conflict of interest influenced the

8   Plan Administrator and review Committee. Before Plaintiff ever submitted his claim for benefits,

9   and even before Plaintiff learned about the Policy, Wells Fargo had decided that some employees

10  affected by the Policy were not entitled to severance benefits.[3] This is clear from the "talking

11  points" email sent to HR Managers on March 30, 2009, wherein HR Managers were instructed to

12  use "[t]he response Corporate legal has crafted" when asked whether those affected by the Policy

13  would be entitled to severance benefits. *See* Goddard Decl. Ex. 8 at 227-28. The final sentence of

14  the "crafted" response accurately reflects Wells Fargo's position: "*The fact that Wells Fargo has*

15  *chosen not to sponsor a team member for a employer-sponsor visa does not trigger salary*

16  *continuation benefits.*" *Id.* Wells Fargo's predetermination that those affected by the Policy were

17  not entitled to benefits is also clear from the "Q & A" attached to the "Displacement Selection

18  Process for Team Members on Employer-sponsored Visas and Student Visas," which states that

19  employees are not eligible for benefits if management does not pursue visa renewal because "the

20  decision to not renew or seek a new visa does not equate to job elimination." Goddard Decl. Ex. 7

21  at 417.

22        In *Jebian v. Hewlett-Packard*, the Ninth Circuit held that "[d]eference to an exercise of

23  discretion requires discretion actually to have been exercised." 349 F.3d 1098, 1106 (9th Cir.

24

25        [3] To clarify, some visa-holder employees were entitled to benefits—those employees who
26  were selected for displacement and whose visas expired after the date of the anticipated Notice
    Period. *See* Hurley Decl. Ex. B; Eggers Decl. ¶ 6 ("the Plan paid lump sum severance to
27  individuals who held H1-B visas, whose visa expiration date followed their lump sum severance
    payout under the Plan.").
28

2003).  The plan administrator in *Jebian* had failed to grant or deny a claim for benefits before the date the claim for benefits was "deemed denied" by the terms of the plan.  The court held that de novo review applied because even though the plan terms conferred discretionary authority upon the plan administrator, the plan administrator had failed to use that discretionary authority.  *Id.* at 1104 ("Decisions made outside the boundaries of conferred discretion are not exercises of discretion, the substance of the decisions notwithstanding.").

In *Jebian*, the opportunity to use discretion had been precluded by the terms of the plan.  The difference in this case is that, although Wells Fargo predetermined that employees such as Plaintiff would not be eligible for benefits, the Plan Administrator and Committee still purported to make the decision to deny Plaintiff's claim in particular.  That is to say, although a company-wide decision had been made, the Plan Administrator and Committee still had the opportunity as independent ERISA fiduciaries to exercise their discretion—going against the company policy— and award Plaintiff benefits.  Thus, the Court finds that unlike in *Jebian*, the abuse of discretion standard still applies.  The question is therefore: *How much discretion did the Plan Administrator and Committee exercise considering the fact Wells Fargo had already determined that employees in Plaintiff's position affected by the Policy were not entitled to benefits?*

There are indications that the Plan Administrator and Committee were somewhat influenced by Wells Fargo's previous determination that those affected by the Policy were not entitled to benefits.  The Committee's handwritten notes shows that the Committee considered the fact that their decision to deny Plaintiff benefits was "consistent with change in visa sponsorship policy."  Goddard Decl. Ex. 27 at 279.  This is at least some indication that the Committee's decision was influenced by Wells Fargo's previous determination that those affected by the Policy were not entitled to benefits.  Accordingly, the Court finds that the structural conflict of interest in this case weighs somewhat against the Plan Administrator and Committee.

### 2.  *Whether Plaintiff is Entitled to Severance Benefits under the Plan*

The Parties agree that Plaintiff is only entitled to severance benefits under the Plan if Plaintiff experienced a "Qualifying Event" as defined by the Plan.  Thus, the question is whether Plaintiff experienced a "Position Elimination," which is defined by the Plan as the "[e]limination

16

of all or part of the position held by a Participant or any other form of reduction in force initiated by [Wells Fargo] affecting a Participant's position." JSUF ¶ 8.

The Plan Administrator and Committee found that Plaintiff did not experience a "Position Elimination" by reasoning that Wells Fargo did not eliminate Plaintiff's position by enacting the Policy. Rather, they found that once Plaintiff's visa expired, Plaintiff would no longer be able to fulfill a requirement of the job that he have legal status to work in the United States. The Plan Administrator and Committee both cited the fact that after Plaintiff submitted his resignation, Wells Fargo had to hire a contractor to fill Plaintiff's position, which is evidence that Plaintiff's *particular job* was not eliminated. Eggers Decl. Ex. A at 41, 253. The Court finds that the Plan Administrator and the Committee did not abuse their discretion.

Plaintiff argues that the Plan Administrator and Committee abused their discretion by ignoring the second part of the definition of a "Position Elimination," which includes "any other form of reduction in force initiated by [Wells Fargo] affecting a Participant's position." JSUF ¶ 8. However, any reduction in force as a result of the Policy did not alter the "position." The evidence shows that after Plaintiff submitted his resignation, Wells Fargo posted to fill the position and then filled it with a contractor. The Policy, therefore, had no effect on Plaintiff's "position" at all. Accordingly, finding that Plaintiff did not experience a Qualifying Event and was not owed benefits under the Plan was not an abuse of discretion, even considering the conflict of interest in this case.

### D.     ERISA § 510, 29 U.S.C. § 1140

The Court now turns to Plaintiff's second claim for relief under ERISA § 510(a)(1)(B), 29 U.S.C. § 1140, which provides, in relevant part:

> It shall be unlawful for any person to discharge, fine, suspend, expel, discipline, or *discriminate* against a participant … *for the purpose of interfering* with the attainment of any right to which such participant may become entitled under [an ERISA employee benefit] plan….

29 U.S.C. § 1140 (emphasis added). Defendants move for summary judgment on Plaintiff's Section 510 claim on two separate grounds. First, Defendants argue that the claim is time barred.

United States District Court
Northern District of California

17

1   Second, Defendants contend the Section 510 claim fails on the merits.

2              **1.**   ***Whether Plaintiff's Section 510 Claim is Time-Barred***

3          Section 510 does not contain its own statute of limitations, thus the Court must apply the

4   most analogous state law statute of limitations period.  *Burrey v. Pacific Gas & Electric Company*,

5   159 F.3d 388, 396 (9th Cir. 1998).  The parties agree that the two-year statute of limitations from

6   California Code of Civil Procedure § 335.1 applies to Plaintiff's Section claim.  *See* Motion at 13-

7   14; Opp. at 16:16; *Burrey*, 159 F.3d at 396.[4]  The Parties disagree, however, on the date the cause

8   of action accrued, as well as whether equitably tolling applies to Plaintiff's claim.[5]

9              **i.**   **Accrual of Plaintiff's Section 510 Claim**

10         Defendants contend that Plaintiff's cause of action accrued in April 2009−nearly three

11  years before Plaintiff filed this lawsuit on March 19, 2012−when Plaintiff's manager Mr. Hsu

12  informed Plaintiff of Wells Fargo's Policy not to renew H-1B visas.  It is undisputed that on April

13  6, 2009, Ms. Hsu informed Plaintiff that Wells Fargo decided not to renew his visa.  JSUF ¶ 15.

14  In the alternative, Defendants contend that the latest dates in which Plaintiff's cause of action

15  could have possibly accrued are on February 16, 2010, when Plaintiff submitted his resignation

16  email, or on March 2, 2010, the date Plaintiff's employment at Wells Fargo was terminated.

17  Defendants note that these two later dates are still more than two years before March 19, 2012.

18         Nevertheless, Plaintiff contends that he was not aware of the "discriminatory intent"

19  behind Wells Fargo's nonrenewal Policy until he was unequivocally informed by Wells Fargo that

20  his termination as a result of visa expiration did not entitle him to severance benefits.  Plaintiff

21  therefore argues that his Section 510 claim accrued on September 28, 2010, the day Ms.

22  Francovich informed Plaintiff in an email that he would not receive severance benefits.  *See*

23

24         [4] In *Burrey*, the Ninth Circuit reasoned that a claim arising under ERISA § 510 was most
25  analogous to a state law claim for wrongful termination in violation of public policy.  *Id*. at 396-
    97.  At the time *Burrey* was decided, the one-year statute of limitations from California Code of
26  Civil Procedure § 340(3) applied to such claims.  Since 2002, however, the two-year statute of
    limitations from California Code of Civil Procedure § 335.1 applies to such claims.
27         [5] Plaintiff also argues that Defendants should be equitably estopped from asserting a statute
    of limitations defense.  The Court does not reach this argument because Plaintiff's claim will be
28  equitably tolled.

1   Eggers Decl. Ex. A at 45.

2       Federal common law establishes the accrual date of a claim under a federal statute.  *See*

3   *Tolle v. Carroll Touch, Inc.*, 977 F.2d 1129, 1138 (7th Cir. 1992) (applying federal common law

4   to determine the accrual date of a cause of action under section 510); *Pouncil v. Tilton*, 704 F.3d

5   568, 573-74 (9th Cir. 2012) (applying federal common law to determine the accrual date of a

6   cause of action under 42 U.S.C. § 1983).  Under federal law, "a claim accrues when the plaintiff

7   knows or has reason to know of the injury which is the basis of the action."  *Azer v. Connell*, 306

8   F.3d 930, 936 (9th Cir. 2002).

9       While the Ninth Circuit has not explicitly considered when a cause of action under Section

10  510 accrues, at least three of its sister circuits have.  *See Tolle v. Carroll Touch, Inc.*, 977 F.3d at

11  1138-41; *Jakimas v. Hoffman-La Roche, Inc.*, 483 F.3d 770, 777-80 (3rd Cir. 2007); *Edes v.*

12  *Verizon Commc'ns, Inc.*, 417 F.3d 133, 139 (1st Cir. 2005).  The First, Third and Seventh Circuits

13  agree that a cause of action under Section 510 accrues when a plaintiff discovers the unlawful act

14  prohibited by Section 510.  *See id.*  The courts were guided by the Supreme Court's decision in

15  *Delaware State College v. Ricks*, 449 U.S. 250 (1980), where the Court held that a cause of action

16  under Title VII accrues at the time an employment decision is made, not when the injury or

17  consequences of that decision are felt.  *See id.* at 261.  The Third Circuit was also persuaded by

18  *Chardon v. Fernandez*, 454 U.S. 6 (1981), where the Supreme Court held that the accrual rule in

19  *Ricks* applied to a § 1983 claim such that the one year limitations period began to run when notice

20  of termination was given, not on date when employment was terminated.  *Jakimas*, 483 F.3d at

21  779.

22      In *Tolle*, the Seventh Circuit considered whether the plaintiff's claim under Section 510

23  accrued when the plaintiff was terminated, or rather when the plaintiff was denied benefits.  The

24  court rejected the argument that a cause of action under Section 510 necessarily accrues upon the

25  denial of benefits, reasoning that "the different nature of Section 510 calls for a different focus

26  when determining when claims under [Section 510] accrue."  *Id.* at 1139.  The court continued:

27          Because the relevant portions of Section 510 aim to prevent
           employers and other persons from *taking action* for purposes of
28          preventing a participant from or punishing a participant for

19

United States District Court
Northern District of California

exercising his or her rights under a plan, the accrual of Section 510 claims turns on *such actions*.

*Id.* at 1140 (emphasis added).  The court held that "it is the *termination* that was allegedly done for the *purposes* of avoiding payment of benefits and Tolle's discovery of this action which serve as the basis for accrual."  *Id.* (emphasis in original).

While the relevant unlawful act in *Tolle* was the plaintiff's termination, the relevant unlawful act in this case is Wells Fargo's enactment of an allegedly discriminatory Policy.  *See Ricks*, 449 U.S. at 261 (alleged illegal act was racial discrimination in a tenure decision).  Section 510 prohibits employers from taking a variety of actions ("discharge, fine, suspend, expel, discipline, or discriminate against") for the "purpose of interfering with" benefits to which a participant is entitled.  *See* 29 U.S.C. § 1140.  The accrual of a Section 510 turns on the time in which a plaintiff learns of the discharge, fine, suspension, expulsion, discipline, or discriminatory act which was allegedly undertaken to interfere with the plaintiff's benefits.  *Tolle*, 977 F.2d at 1140.  It is undisputed that Plaintiff has been aware of the Policy since April 2009.  Plaintiff did not file the instant action until March 19, 2012, more than two years after April 2009.  By that time, the statute of limitations had run.

Furthermore, Plaintiff's argument that the cause of action did not accrue until September 28, 2010 when Plaintiff was informed again that he would not receive severance benefits makes little sense.  First, Plaintiff learned of this fact not later than his last day of work—March 2, 2010—over two years before this action was filed.  Moreover, the crux of Plaintiff's argument is that the denial of severance benefits triggered accrual of the claim as opposed to the unlawful act prohibited by Section 510.  Such reasoning was rejected by the *Tolle* court, and will be rejected here because accrual turns "on the discriminatory act, not when the effects of that act are felt."  *Jakimas*, 485 F.3d at 779.

### ii.    Equitable Tolling

Even if Plaintiff's Section 510 claim accrued more than two years before this lawsuit was filed, it will not be time-barred if the equitable tolling doctrine applies.  "Along with the statute of limitations period, the court borrows the state's equitable tolling rules, absent a reason not to do so."  *Daviton v. Columbia/HCA Healthcare Corp.*, 241 F.3d 1131 (9th Cir. 2001) (*en banc*).

1    Under California law, a three-pronged test determines whether a plaintiff's cause of action should

2    be equitably tolled. "The three elements of the test are: (1) timely notice to the defendant in filing

3    the first claim; (2) lack of prejudice to the defendant in gathering evidence to defend against the

4    second claim; and (3) good faith and reasonable conduct by the plaintiff in filing the second

5    claim." *Lucchesi v. Bar-O Boys Ranch*, 353 F.3d 691, 694-95 (9th Cir. 2003) (citing *Collier v.*

6    *City of Pasadena,* 142 Cal.App.3d 917, 924 (1983)).

7         Plaintiff contends that his Section 510 claim should be equitably tolled because on

8    December 21, 2010, Plaintiff submitted his claim for severance benefits under the Plan, which was

9    required before Plaintiff could file a claim under ERISA § 502(a)(1)(B) for benefits owed to him

10   under the Plan. Plaintiff argues that since he submitted his claim for severance benefits,

11   Defendants have been on notice of the need to investigate the lawfulness of its visa nonrenewal

12   Policy. Plaintiff bases his argument on the well-settled rule that "the running of the limitations

13   period is tolled when an injured person has several legal remedies and, reasonably and in good

14   faith, pursues one." *Elkins v. Derby*, 12 Cal.3d 410, 414 (1974) (internal citations omitted)

15   (holding that the statute of limitations against an employer was tolled while an employee pursued

16   his workers' compensation claims arising out of the same accident). Plaintiff also argues that

17   Defendants have suffered no prejudice, that Plaintiff's conduct was reasonable and in good faith,

18   and that it would be inequitable to dismiss Plaintiff's Section 510 claim.

19        Defendants contend, however, that Plaintiff has failed to meet the "threshold requirement"

20   of showing that his claims under Section 502 and Section 510 are based upon the same wrong.

21   Defendants note that "California has long refused to apply the equitable tolling doctrine to toll the

22   statute of limitations on a claim for a distinct wrong that was not the basis of the earlier

23   proceeding." *Daviton*, 241 F.3d at 1141. Defendants further contend that the Ninth Circuit has

24   held that Sections 502 and 510 are designed to "remedy different wrongs; one section corrects any

25   improper action taken with respect to the benefits plan itself and the other punishes an improper

26   action taken with respect to the individual's employment status." *Hinton v. Pacific Enterprises*, 5

27   F.3d 391, 394 (9th Cir. 1993).

28        Defendants' argument is based on two incorrect assumptions of the law. The first is the

United States District Court
Northern District of California

21

assumption that determining whether Plaintiff's claims are based upon distinct wrongs is a "threshold" inquiry that precedes California's three-part test to determine whether a claim should be equitably tolled.  In *Cervantes v. City of San Diego*, the Ninth Circuit reversed the district court for concluding that two claims were not 'substantially similar' without applying the three-part equitable tolling test:

> "[S]imilarity" of the prior and current claims is a matter best determined following, and on the basis of, the application of the three-part equitable tolling test established by California law. Although we have previously stated that "equitable tolling is not applicable when a plaintiff has pursued a remedy as to only one of several distinct wrongs," *Donohue*, 848 F.2d at 931, we have never suggested that in reaching that determination the district court may bypass the traditional method for determining California equitable tolling issues.  It is the application of California's equitable tolling test itself that yields the "final" conclusion as to whether two claims are "similar" enough that the pendency of the one should toll the limitations period for the other.  Although "similarity" often serves as a shorthand designation of the outcome of the test, it is neither separable from nor a "threshold" to the requisite three-part inquiry. Application of the three-part test is mandatory.

5 F.3d 1273, 1275-76 (9th Cir. 1993).  Moreover, when the Ninth Circuit sat *en banc* in *Daviton*, the court overruled a previous Ninth Circuit decision−*Fobbs V. Holy Cross Health System Corporation*, 29 F.3d 1439 (9th Cir. 1994)−which imposed an additional "threshold" requirement to California's equitable tolling test that plaintiff's two claims seek similar "remedies."  *Daviton*, 241 F.3d at 1133.  In doing so, the *en banc* court held that "*Cervantes* properly sets forth the California law on equitable tolling," *see id.*, and further quoted *Cervantes* for the proposition that "'[s]imilarity' is a legal conclusion that follows from the mandatory application of the 'equitable tolling test.'"  *Daviton*, 241 F.3d at 1140 (quoting *Cervantes*, 5 F.3d at 1276).

The Court recognizes that in *Lucchesi*, a three-judge panel of the Ninth Circuit wrote that "[i]f a plaintiff's first claim and second claim concern different wrongs, however, equitable tolling is not available and the three-pronged test is not applied."  *Lucchesi*, 353 F.3d at 695 (citing *Loehr v. Ventura Cnty. Comm. College Dist.*, 147 Cal.App.3d 1071 (1983); *Arnold v. United States*, 816 F.2d 1306 (9th Cir. 1987).  The *Lucchesi* court cited two cases−*Loehr* and *Arnold*−purportedly in support.  Nevertheless, while *Loehr* and *Arnold* both consider whether two claims involve distinct

22

United States District Court
Northern District of California

1   wrongs, neither case stands for the proposition that this determination is separate from the three-

2   part test.  To the contrary, both courts reference the three-part test and simply proceed to consider

3   whether two claims are based on distinct wrongs.  *See Loehr*, 147 Cal.App. at 1084; *Arnold*, 816

4   F.2d at 1312-13.  Moreover, the Ninth Circuit, like this Court, must apply California's law

5   governing the equitable tolling doctrine.  *Daviton*, 241 F.3d at 1131.  Because this Court is

6   unaware of any California case which makes the determination of distinct wrongs separate from

7   California's traditional three-part equitable tolling test, the Court follows *Cervantes* and considers

8   whether Plaintiff's claims are based on distinct wrongs through application of the three-part test.

9   However, before doing so, the Court must correct Defendant's second faulty assumption.

10   Contrary to Defendants' contention, the Ninth Circuit in *Hinton* did not hold that, for purposes of

11   equitable tolling, the facts forming the basis of a Section 502 and Section 510 claim must

12   necessarily constitute "distinct wrongs."  *See Hinton*, 5 F.3d at 394.  Rather, in the context of

13   deciding which statute of limitations should be applied to a Section 510 claim, and in rejecting the

14   plaintiff's argument that "because § 510 incorporates enforcement under § 502, the same statute of

15   limitations used in § 502 should be adopted," the court reasoned that the statute of limitations from

16   Section 502 did not apply because Sections 502 and 510 "remedy different wrongs."  *Id*.

17   When addressing the *equitable tolling* issue in *Hinton*, the court held that the plaintiff's

18   claim for retaliatory discharge was a distinct wrong from the plaintiff's claim under Section 510

19   regarding unlawful termination intended to interfere with the plaintiff's rights to receive benefits.

20   *Hinton*, 5 F.3d at 396.  In other cases, the Ninth Circuit and California Court of Appeal have

21   similarly held that the presentation of one claim did not equitably toll another claim that was based

22   on a "distinct wrong."  *See Arnold*, 816 F.2d at 1313 (filing of Title VII claims for sexual

23   harassment and discrimination did not toll state tort claims for assault, battery, false imprisonment

24   and intentional infliction of emotional distress); *Loehr*, 147 Cal.App.3d at 1085 (filing of various

25   state law claims "based upon a set of facts independent of those set forth" in a untimely filed §

26   1983 claim did not toll the § 1983 claim); *Aerojet General Corporation v. Superior Court*, 177

27   Cal.App.3d 950 (1986) (filing of a worker's compensation claim for personal injury did not

28   equitably toll the limitations period for a claim for fraudulent concealment); *but see Lucchesi*, 353

F.3d at 694-95 (reversing summary judgment in favor of defendant because the pursuit of state law claims tolled the statute of limitations for a § 1983 claim which "echoe[d] the allegations made in the tort claim").

What is noticeably absent these cases, however, is any indication that because two claims are based on different laws−such as Section 510 and Section 502−the claims would necessarily constitute "distinct wrongs." Indeed, the Ninth Circuit has held that "[t]he fact that two claims may be separate, distinct and independent insofar as they are founded upon *different laws*, involve different procedures or seek different remedies does not compel the conclusion that they arise from separate wrongs." *Lucchesi*, 353 F.3d at 694-95 (emphasis added). The Ninth Circuit has further stated that, "[i]n terms of the underlying policies of the statutes of limitation, it is irrelevant whether those two claims are alternative or parallel, consistent or inconsistent, compatible or incompatible." *Daviton*, 241 F.3d at 1138 (quoting *Collier*, 142 Cal.App.3d at 925-26). Rather, "determining the applicability of equitable tolling necessitates resort to the specific circumstances of the prior claim: parties involved, issues raised, evidence considered, and discovery conducted." *Daviton*, 241 F.3d at 1140 (quoting *Cervantes*, 5 F.3d at 1276). With this background, the Court applies California's equitable tolling test to the facts of this case.

### a. *Timely Notice*

The first prong, timely notice, "requires that plaintiff have filed the first claim within the statutory period" and "alert the defendant in the second claim of the need to begin investigating the facts which form the basis for the second claim." *Daviton*, 241 F.3d at 1138 (internal quotations omitted). "No specific type of notice is required … as long as defendant has adequate opportunity to gather and preserve evidence." *Id*. at 1139 (citing *Elkins v. Derby*, 12 Cal.3d 410, 415 (1974) (in bank)).

Here, Plaintiff's submission of his claim for benefits on December 20, 2010 was timely. In his claim, Plaintiff wrote: "As Wells Fargo is no doubt aware, refusing to renew an HIB visa is equivalent to a termination," which entitles Plaintiff to severance benefits under the Plan. Eggers Decl. Ex. A at 104. Thus, upon the submission of Plaintiff's claim for benefits, Defendants were aware that Plaintiff believed he was owed severance benefits as a result of the Policy, even though

1 he was not formally laid off or terminated. By this time, Defendants were also aware that Plaintiff

2 believed the Policy "discriminated against [] foreign nationals," as Plaintiff had indicated such in

3 his exit interview. Eggers Decl. Ex. A at 35. While Defendants note that Plaintiff did not argue in

4 his claim that the Policy was "intended to interfere" with benefits, Plaintiff was not required to cite

5 the language or purpose of Section 510 so long as his first claim put Defendants on notice "of the

6 need to begin investigating the facts which form the basis for the second claim." *Daviton*, 241

7 F.3d at 1138. Plaintiff did just that by submitting his claim for benefits.

8 b. *Prejudice*

9   The second requirement is that there is no "prejudice to the defendant in gathering

10 evidence to defend against the second claim." *Lucchesi*, 353 F.3d at 694-95 (citing *Collier*, 142

11 Cal.App.3d at 924. This requirement is satisfied if "the facts of the two claims [are] identical or at

12 least so similar that the defendant's investigation of the first claim will put him in a position to

13 fairly defend the second." *Daviton*, 241 F.3d at 1138 (quoting *Collier*, 142 Cal.App.3d at 925).

14 The claims need not be identical. "So long as the two claims are based on essentially the same set

15 of facts timely investigation of the first claim should put the defendant in position to appropriately

16 defend the second." *Daviton*, 241 F.3d at 1138 (quoting *Collier*, 142 Cal.App.3d at 925-26).

17 "The critical question is whether notice of the first claim affords the defendant an opportunity to

18 identify the sources of evidence which might be needed to defend against the second claim."

19 *Collier*, 142 Cal.App.3d at 925.

20   The Court finds that Defendants will not be prejudiced if Plaintiff is allowed to proceed on

21 his Section 510 claim. When Plaintiff submitted his claim for benefits, he put Defendants on

22 notice that he believed he was entitled to benefits on the basis that he would be ineligible to

23 continue working as a result of Wells Fargo's Policy not to renew H-1B visas. Plaintiff's two

24 claims are "based on essentially the same set of facts." *Collier*, 142 Cal.App.3d at 925. There is a

25 substantial overlap between the evidence needed to prove non-entitlement to benefits as a result of

26 the Policy and the evidence needed to prove that Defendants did not implement the Policy to

27 interfere with benefits. While Defendants contend these claims entail "separate universes of

28 evidence," Reply at 12, that is simply not true. Both claims involve Wells Fargo's Policy not to

25

renew H-1B visas as well as Plaintiff's entitlement to benefits.  Thus, Plaintiff provided

Defendants with the "opportunity to identify the sources of evidence which might be needed to

defend against" the Section 510 claim.  *Id*.

### c.   *Good Faith and Reasonable Conduct*

The final requirement is that Plaintiff exercised "good faith and reasonable conduct" in

filing the second claim.  *Lucchesi*, 353 F.3d at 694-95 (citing *Collier*, 142 Cal.App.3d at 924).

Plaintiff filed his Section 510 claim simultaneously with his Section 502 claim on March 19, 2012.

Before Plaintiff was able to file his Section 502 claim, however, he was required to exhaust all

administrative remedies by submitting a claim for benefits and appeal with the Plan Administrator

for Wells Fargo's severance Plan.  Plaintiff exhausted his administrative remedies for the Section

502 claim on September 1, 2011.  Thus, if Plaintiff were to file his Section 510 claim by the end of

the applicable statute of limitations period, in April 2011, he would have had to file two separate

lawsuits.

As explained by the California Supreme Court in *Elkins*, "an awkward duplication of

procedures is not necessary to serve the fundamental purpose of the limitations statute[.]"  *Elkins*,

12 Cal.3d at 412.  In allowing one claim to be equitably tolled based on the timely filing of

another claim, the *Elkins* court considered "the inequity that a duplicative filing requirement might

work upon an injured party," and noted that "duplicative proceedings are surely inefficient,

awkward and laborious."  *Elkins*, 12 Cal.3d 410, 420 (1974).  Considering the fact that Plaintiff

had no choice but to delay the filing of his Section 510 claim in order to proceed in one lawsuit,

there is no basis to conclude in that Plaintiff's actions were anything but reasonable and in good

faith.  Accordingly, Plaintiff's Section 510 claim will be equitably tolled.

### 2.   *The Merits of Plaintiff's Section 510 Claim*

Defendants also argue they are entitled to summary judgment on Plaintiff's Section 510

claim because Plaintiff's evidence does not show that Wells Fargo discriminated against Plaintiff

for the purpose of interfering with his severance benefits.  When the challenged act in a Section

510 claim is discrimination, a plaintiff must "put forth sufficient evidence to establish [Wells

Fargo's] specific intent to interfere with [his] benefit rights."  *Lessard v. Applied Risk*

*Management*, 307 F.3d 1020, 1025 (9th Cir. 2002).  A plaintiff may do so by presenting direct proof of discrimination, or in the absence of direct proof, circumstantial evidence of discrimination using the *McDonnell Douglas* burden-shifting framework applied in Title VII and ADEA claims.  *Id*. (citing *Ritter v. Hughes Aircraft Co.*, 58 F.3d 454, 457 (9th Cir. 1995)).  The question in this case is whether Plaintiff has submitted sufficient evidence of discrimination−either direct or circumstantial−to show a genuine issue of material fact which precludes summary judgment on Plaintiff's Section 510 claim.

### i.    Direct Evidence of Discrimination

The Ninth Circuit found direct evidence of discrimination with regard to a Section 510 claim in *Lessard*.  The plaintiff in *Lessard* was an employee of Applied Risk Management, Inc. ("ARM") who became a non-active employee on workers' compensation leave prior to the purchase of all ARM's assets by PRM/MMI, another company.  *Lessard*, 307 F.3d at 1022.  Under the purchase agreement, ARM employees were automatically transferred to active employment with PRM/MMI coincident with the execution of the sale, and were covered under PRM/MMI's welfare benefits plan without an interruption in coverage.  *Id*.  There was one condition, however, to each employee's automatic transfer to employment with PRM/MMI: "In order to be eligible for transfer, the employee had to be actively employed by ARM (i.e., 'at work') on the day of the sale or on non-medical, non-extended leave from active employment."  *Id*.  "However, the Agreement excepted from the condition employees who were on vacation or who had taken a personal day and thus were not 'at work' on [the day of the sale]."  *Id*.

While the purchase agreement provided that non-active employees would become eligible for transfer if and when they returned to active employment, the plaintiff in *Lessard* could not return to active employment due to her medical condition.  Meanwhile, the plaintiff's benefits were terminated because the terms of the purchase agreement precluded the plaintiff from being an employee of PRM/MMI.  The Ninth Circuit found that the condition in the purchase agreement excluding from automatic transfer to PRM/MMI employees on medical and extended leave was discriminatory on its face:

> Here, Lessard's proof of discrimination is direct and uncontroverted. Section 7.2(a) of the Agreement facially discriminates against employees who were on disability, workers' compensation, and any other form of extended leave, explicitly excepting from its separate schedule for conditional transfer any employee who was absent from work due to vacation, holiday, or personal reasons. At the time the companies executed the Agreement, they knew that five of the six employees placed on the deferred schedule were on some form of medical leave or disability-related leave. We find that this conduct constitutes discrimination on its face.

*Id*. at 1025-26.

Plaintiff contends that under *Lessard*, the Court should find that Wells Fargo's Policy not to renew H-1B visas was discriminatory on its face and intended to interfere with the rights of H-1B visa holders to receive severance benefits. Plaintiff cites the confidential memorandum sent to HR Managers charged with implementing the Policy, which states: "*The fact that Wells Fargo has chosen not to sponsor a team member for an employer-sponsored visa does not trigger salary continuation benefits.*" Goddard Decl. Ex. 8. Wells Fargo contends the Policy cannot be discriminatory on its face because unlike in *Lessard*, the Policy does not even mention severance benefits.

As a preliminary matter, the Court disagrees with Wells Fargo's contention that the Policy does not mention severance benefits. No single document describes the full scope of the Policy, thus all documents discussing the Policy will be considered. Several documents, such as the confidential memorandum sent to HR Managers, show that Wells Fargo decided that those affected by the Policy would not be eligible for benefits if they were not otherwise selected for displacement. *See, e.g*., Goddard Decl. Exs. 7-8. Moreover, the "Displacement Selection Process for Team Members on Employer-sponsored Visas and Student Visas" describes the process by which visa holders were incorporated into Wells Fargo's general displacement process. *See* Hurley Decl. Ex. B. Some employees affected by the Policy received severance benefits, such as those who were selected for displacement and whose work authorization expired after the end of the Notice Period. *See id*. at 414; Eggers Decl. ¶ 6. Other employees affected by the Policy did not receive severance benefits, such as those who may have been selected for displacement but whose work authorization expired before the end of the Notice Period. Hurley Decl. Ex. B. at

414; Goddard Decl. Ex. 8.

Nevertheless, a policy is not discriminatory on its face merely because it explicitly states certain employees will not receive severance benefits. *Lessard* does not stand for the proposition that whenever someone is explicitly denied benefits, there is direct evidence of discrimination. Rather, the Ninth Circuit found facial discrimination in *Lessard* because the purchase agreement directly referenced employees on medical and extended leave and explicitly excluded them from automatic transfer of employment from ARM to PRM/MMI, which had the effect of terminating their welfare benefits. *Lessard*, 307 F.3d at 1022. The purchase agreement explicitly targeted employees on medical and extended leave and precluded them from uninterrupted coverage.

Here, however, Wells Fargo's Policy does not explicitly exclude all employees affected by the Policy from receiving benefits. Rather, the "Displacement Selection Process for Team Members on Employer-sponsored Visas and Student Visas" shows that some employees affected by the Policy would receive benefits, and some would not, depending on whether they were selected for displacement and the expiration date of their work authorization. *See* Hurley Decl. Ex. B. Moreover, while it is true that Wells Fargo decided all employees affected by the Policy and not selected for displacement would not receive severance benefits, this is not direct evidence of discrimination. "Direct evidence, if found to be true, is conclusive of the facts testified to." *McKenzie v. Risley*, 842 F.2d 1525, 1562 (9th Cir. 1988). Wells Fargo's decision could reflect an administrative decision merely implementing a neutral Policy. Thus, the fact Wells Fargo determined some of those employees affected by the Policy were not entitled to benefits is not itself direct evidence of discrimination.

### ii.       Circumstantial Evidence of Discrimination

Even if the Policy does not constitute direct evidence of discrimination, Plaintiff may submit circumstantial evidence to preclude summary judgment in favor Wells Fargo. Under the *McDonnell Douglas* framework, a plaintiff must first present a prima facie case of discrimination, which results in a presumption that the employer unlawfully discriminated against the employee. *Lessard*, 307 F.3d at 1025 n. 3. If the plaintiff establishes a prima facie case, the burden then shifts to the defendant to present a legitimate, nondiscriminatory reason for the adverse

1    employment action. *Id.* If the defendant meets this burden, the burden then shifts back to the

2    plaintiff to show that the defendant's proffered reason is pretext for discrimination. *Id*.

3                            a.    *Prima Facie Case*

4            In the context of a Section 510 claim, a plaintiff may establish a prima facie case by

5    showing: "(1) an employee participates in a statutorily protected activity, (2) an adverse

6    employment action is taken against him or her, and (3) a causal connection existed between the

7    two." *Kimbro v. Atlantic Richfield Co.*, 889 F.2d 869, 881 (9th Cir. 1989). Wells Fargo argues

8    that Plaintiff cannot meet any element of his prima facie case.

9            The "statutorily protected activity" in this case was Plaintiff's participation in the Plan.

10   Wells Fargo argues that Plaintiff cannot establish this first element because after his voluntary

11   departure from Wells Fargo in February 2010, Plaintiff lost participant status under the Plan. This

12   argument is without merit. For the same reason Plaintiff's Section 510 claim accrued in April

13   2009 when Plaintiff learned about the Policy, the relevant question here is whether Plaintiff

14   participated in statutorily protected activity when the adverse employment action—the alleged

15   discrimination—occurred. Plaintiff was eligible for benefits, and thus participated in statutorily

16   protected activity, when the Policy was implemented in April 2009. The Committee recognized

17   this when they wrote "that during April 2009, Mr. Karamsetty met the eligibility requirements to

18   be considered a Plan participant." Eggers Decl. Ex. A at 251. Thus, Plaintiff has met the first

19   element of his prima facie case.

20           Next, Wells Fargo argues that Plaintiff suffered no adverse employment action because

21   Wells Fargo did not terminate his employment. Rather, Wells Fargo contends that because

22   Plaintiff voluntarily left Wells Fargo, he cannot establish any adverse employment action unless

23   he meets the standard for showing a constructive discharge, which "is implicated only where an

24   employer creates conditions so intolerable that a reasonable person would resign." *Fischer v.*

25   *Andersen Corp.*, 483 F.3d 553, 556 (8th Cir. 2007). This argument is also meritless. Plaintiff

26   does not need to show intolerable conditions or even that he was constructively discharged. The

27   prima facie case for a Section 510 claim is satisfied when a plaintiff provides evidence of an act

28   which would interfere with his benefits. In this case, the Policy satisfies this element by its

United States District Court
Northern District of California

30

1    terms—Plaintiff would not be eligible for benefits when his visa expired.  That is an adverse

2    employment action.

3           The final element of Plaintiff's prima facie case is the causal connection between the

4    statutorily protected activity and the adverse employment action.  On the one hand, "ERISA

5    provides no relief if the loss of an employee's benefits was incidental to, and not the reason for,

6    the adverse employment action."  *Lehman v. Prudential Ins. Co. of Amer.*, 74 F.3d 323, 330-31

7    (1st. Cir. 1996).  On the other hand, "[a] plaintiff is not required to prove that interference with

8    ERISA rights was the sole reason for the discharge but must show more than the incidental loss of

9    benefits as a result of the discharge."  *Gitlitz v. Compagnie Nationale Air France*, 129 F.3d 554

10   (11th Cir. 1997).

11          This element is easily satisfied.  Plaintiff's eligibility for benefits was cut off when the

12   Policy was implemented.[6]

13                  b.      *Wells Fargo's Nondiscriminatory Reason*

14          Having established his prima facie case of discrimination, the burden of production, but

15   not the burden of persuasion, shifts to Wells Fargo to present a legitimate, nondiscriminatory

16   reason for the adverse employment action.  *Lessard*, 307 F.3d at 1025 n. 3; *Texas Dep't of Cmty.*

17   *Affairs v. Burdine*, 450 U.S. 248, 254 (1981) ("The defendant need not persuade the court that it

18   was actually motivated by the proffered reasons.").  Wells Fargo argues that it implemented the

19   Policy "[d]ue to the increased talent pool within Wells Fargo and the United States, Wells Fargo

20   chose to only sponsor H1-B visas affirmatively where necessary for the line of business."  Motion

21   at 21.  Ms. Hurley writs in her declaration that "[t]he purpose of the Policy was to decrease Wells

22   Fargo's reliance on employer-sponsored visas by utilizing the overall increased talent pool of

23   individuals within Wells Fargo as a result of its merger with Wachovia Corporation, and within

24   the United States, who did not require visa sponsorship to work in the United States."  Hurley

25   Decl. ¶ 3.  The Court finds that Wells Fargo has satisfied its burden of stating a legitimate,

26   nondiscriminatory reason for implementing the Policy.

27   ───────────────────

28          [6] The Court assumes, without deciding, that Plaintiff's claim is not undermined by his
     resignation−which Plaintiff characterizes as a constructive discharge.

United States District Court
Northern District of California

United States District Court
Northern District of California

c.      *Pretext*

The next inquiry is whether Plaintiff has presented sufficient evidence to show a disputed

issue of material fact as to whether Wells Fargo's asserted reason for implementing the Policy is

pretext for discrimination to interfere with benefits.  *Lessard*, 307 F.3d at 1025 n. 3.  There must

be evidence "in addition to that which was sufficient for [a] prima facie case in order to rebut the

defendant's showing."  *Godwin v. Hunt Wesson, Inc.*, 150 F.3d 1217, 1220 (9th Cir. 1998).  On

summary judgment, the plaintiff's burden is "only to produce enough evidence that would allow a

reasonable factfinder to conclude that the true reason for his discharge was a discriminatory one."

*Nidds v. Schindler Elevator Corp.,* 103 F.3d 854, 859 (9th Cir. 1996).  "Although a plaintiff may

rely on circumstantial evidence to show pretext, such evidence must be both specific and

substantial." *Villiarimo v. Aloha Island Air, Inc.*, 281 F.3d 1054, 1062 (9th Cir. 2002).

Plaintiff does not have sufficient evidence to permit a reasonable jury to find that Wells

Fargo's true motivation for implementing the Policy was to interfere with severance benefits or

that its nondiscriminatory reasons for implementing the Policy are pretext.  A jury could not

reasonably infer from the fact the Policy was implemented due in part to the "economic climate"

that the Policy was driven by a desire to interfere with severance benefits.  Hurley Decl., Ex. A.

The Policy could save Wells Fargo on the costs of recruiting foreign workers, the costs of

transportation for those workers, and the costs filing visa applications and extensions.  These

economic motivations are legitimate and nondiscriminatory under Section 510, which only

proscribes conducted intended to interfere with benefits.  Indeed, Wells Fargo paid severance

benefits to several employees on visas who were selected as part of the displacement process.

Eggers Decl. ¶ 6.  This is indicative of Wells Fargo's nondiscriminatory intent.

There is also insufficient evidence of pretext in the fact that Wells Fargo decided,

simultaneous with its decision to implement the Policy, that employees in Plaintiff's position

would not be eligible for severance benefits.  Implementing the Policy required Wells Fargo to

undertake the administrative task of determining just how the Policy would be implemented.  For

the benefit of the company and its employees, Wells Fargo needed to foresee the Policy's impact

on employees such as Plaintiff who were affected by the Plan but not included in the displacement

selection process.  To make this decision on a broad scale, it was unnecessary for Wells Fargo's legal department to consult with the Plan Administrator, as Plaintiff contends.  The legal department merely read the language of the Plan and correctly determined that such employees are not eligible.  This was an administrative business decision.  It is unreasonable to infer from this administrative act that Wells Fargo intended to discriminate against its employees' rights to severance benefits.

## IV.    CONCLUSION

Accordingly, Defendants' Motion for Summary Judgment is GRANTED.  The Clerk is directed to close the file.

IT IS SO ORDERED.

Dated: August 7, 2013

_____
JOSEPH C. SPERO
United States Magistrate Judge